935 So.2d 110 (2006)
STATE of Florida, Appellant,
v.
Aimee Lee WEISS, Appellee.
No. 4D04-3002.
District Court of Appeal of Florida, Fourth District.
August 9, 2006.
*112 Charles J. Crist, Jr., Attorney General, Tallahassee, and Jeanine M. Germanowicz, Assistant Attorney General, West Palm Beach, for appellant.
Ellis S. Rubin of the Law Offices of Ellis Rubin and Robert I. Barrar, Miami, for appellee.
TAYLOR, J.
The State of Florida appeals the trial court's order granting the defendant's motion to suppress admissions and statements. We affirm, concluding that the trial court correctly determined that the defendant was in custody and, thus, entitled to Miranda warnings. As the state concedes, the warnings were inadequate under Roberts v. State, 874 So.2d 1225 (Fla. 4th DCA 2004), rev. denied sub nom. State v. West, 892 So.2d 1014 (Fla.2005).
Following hearings held on the defendant's motion to suppress over a period of several months, the trial court issued a written order on February 24, 2003, summarizing the testimony at the hearings and making the following findings:
A. FINDING THE INFANT'S BODY: On April 3, 2001 the body of a dead infant was found in a canal near the defendant's home. The body was wrapped in plastic bags, with a pair of panties wrapped around its neck. There were ligature marks on the baby's neck. The body was found inside a backpack along with a ten pound weight. According to a witness, the backpack had been placed in the canal by a white female who fit the description of the defendant. The witness described the girl with a wet backpack as being up to her knees in the canal water. The name Julie Gardner was contained on the backpack, and the name Matthew Walpole was found on a towel inside the backpack. A book was also found at the canal bank, which belonged to one of the defendant's friends.
B. FINDINGS OF MEDICAL EXAMINER: On April 4th, 2001, an autopsy was conducted by the medical examiner's office, which revealed a full term baby boy with no evidence that the baby died of drowning. The ligature marks on the baby's neck was consistent with asphyxia. The medical examiner testified that prior to the defendant giving her taped statement, that no expert opinion could be rendered as to whether or not the child was born alive. In the defendant's subsequent statement, she stated that when she cut the umbilical cord that blood squirted out. She further stated that the color of the baby was pinkish. The medical examiner found that the death was consistent with homicide.
C. The Broward Sheriff's Detectives canvassed the area where the baby was found for a white female fitting the description described by the witness. This investigation led to an interview of the defendant's father, who stated that he had two daughters. The detectives interviewed the defendant, who stated that she had not been pregnant. On April 6, 2001, Detectives of the Broward Sheriff's Office obtained a statement of the defendant's friend, Julie Gardner, who identified the backpack as belonging to her, and who stated that she had loaned the backpack to the Defendant previous to April 3, 2001. A statement was also obtained from Matthew Walpole, who acknowledged that he was the defendant's boyfriend. He acknowledged that the defendant had been pregnant, and stated that the defendant had *113 been taking drugs and alcohol in an attempt to abort the baby. Mr. Walpole told the police that the defendant was spending the night at the Welch residence.
D. On April 7, 2001, detectives obtained a search warrant for the defendant's home. Detective Bukata testified that he told the defendant's father that defendant was at the Public Safety Building being questioned about the dead infant. The defendant's father signed a "consent to search" form to search the residence. Weights were found in the home, which were similar to the weight found in the backpack. Similar panties were found at the residence, which matched the panties wrapped around the baby's neck.
Earlier on the same date, at around 7:00-7:30 A.M., Four Detectives went to the home of Mr. and Mrs. Welsh [sic], where the defendant and her sister were sleeping with Jennifer Welsh. The detectives asked the Defendant and her sister to "accompany" them to the Broward Sheriff's Office for questioning about the "baby case". The defendant was not told that she had a right to refuse to go with the detectives. The detectives transported the defendant and her sister to the Broward Sheriff's Office for questioning. The defendant was told that her father would be notified of her whereabouts.
E. DEFENDANT AT THE BROWARD SHERIFF'S OFFICE: There is a conflict in the witnesses' testimony, as to whether the defendant requested the presence of her father at the Broward Sheriff's Office prior to her interrogation. In her taped statement the defendant recounts that her father was contacted before the tape went on, and that she elected to give the statement before consulting with him. The defendant's sister remained in a waiting room, and the defendant was taken to a conference room where Detective Reed [sic] and Murray interviewed her. The detectives testified that the defendant had been told that her father had been contacted, but she stated she did not want him present during the interview. The defendant was told by the detectives that they knew she had a baby and that they wanted to talk to her about it. Coffee and Donuts were brought in. The defendant at this point had not been given her Miranda Rights, she was not told that she was free to leave; or that she did not have to talk to the detectives. She was advised that she was not under arrest.
The interview of the defendant lasted approximately three hours. Prior to the interview the detectives contacted the medical examiner, who instructed the detectives to find out if there was blood coming from the baby's umbilical cord subsequent to his birth, and to find out the color of the baby's skin at birth. The taped statement of the defendant started at 12:30 P.M. Detective Reed testified that Detective Carmody advised the defendant of her Miranda rights at 9:30 A.M., from a Broward Sheriff's form, which the defendant signed. This form was received into evidence as Exhibit 7. The detectives stated that the defendant never requested an attorney, or to have her father present during the interview. The initial conversation that the defendant had was not recorded. The taped conversation took 39 minutes.
The defendant was shown a picture of the dead baby, and told the detectives that Julie Gardner had given her the backpack. She stated that the baby in the back pack was hers. The defendant described the delivery of the baby, and stated that the clothes that she was wearing at the time of the statement, *114 were the same clothes that she had worn at the time of the delivery of the infant. The defendant was in 12th grade, and was a straight "A" student. She admitted that during her pregnancy that she attempted to force a miscarriage, by pushing heavy furniture and having her boyfriend, Matthew Walpole, jump on her stomach. When questioned about the baby, the defendant stated that the baby was not born alive, but stated that the baby was pink and that blood flowed from the umbilical cord. Follow [sic] the delivery, the defendant acknowledge [sic] that she put the baby in a canal on March 26, 2001. Initially, the bag did not sink, so she retrieved the bag from the water and inserted a 10 1b weight. When she came out of the water she was observed by a neighbor.
3. TESTIMONY OF THE DEFENDANT: The defendant testified that she had slept over at Jennifer Welch's house when the detectives arrived and Detective Reed told her to get dressed. One of the four detectives present told her that she was going to go to her house. The defendant was driven to the police headquarters by Sgt. O'Neil, and she was told that her father would meet her there. Sgt. O'Neil asked her if she wanted her father to sit in with her, and she testified that she said yes. She asked if her father was on the way, and she was told yes. The defendant stated that she was never told that she is free to leave.
4. TESTIMONY OF THE DETECTIVES: Detective Carmody testified that he never told the defendant that her father would be present before the questioning. Detective Reed testified that she transported the defendant from the Welsh home and that the defendant was not told that she was going home. Detective Reed testified that Detective Carmody told the defendant that she was going to the police station. The detective testified that she was informed that her father was on the way to the police station. The defendant did not say that she wanted her father present before she was questioned, and she said that she did not want her father present during the questioning.
Detective James Murray testified that four detectives went to the Welch house at the time that the defendant and her sister Kimberly were "picked up". The defendant was told that the detectives need to talk to her, and that she was going to the station. She did not ask about her father, and Deceptive [sic] Murray stated that he did not attempt to call him. The witness testified that there was no indication to the defendant that she was going to be taken to her home, rather than to the police station. Detective Murray did not inform the defendant that her father would be present during any questioning. When Detective Murray executed the search warrant at the Weiss home, he stated that he told Mr. Weiss that his daughter was being questioned at the Public Safety Building, and he said he did not want to be present during questioning.
Detective Brent Illiraza, testified that he was present at the Welsh home when the defendant was taken into custody. She understood that she was not going to her home, but to the police station. The defendant, according to the witness, was never told that her father would be present before any questioning. The detective testified that the defendant was never advised of her right to refuse to come in for questioning.
Detective Glen Bukata testified that he was involved in the search of the Weiss home. He testified that Mr. Weiss said that it was okay for the detectives to question his daughter, and that he chose *115 to stay home when he was told that his daughter was at the public safety building.
The defendant was charged by indictment with murder in the first degree for premeditated murder of an "unnamed infant child . . . by asphyxia." Her attorney filed motions to suppress her admissions and statements. After making the above factual findings, the trial court ruled that the defendant was in custody for Miranda[1] purposes and that she was subjected to custodial interrogation. In so ruling, the court found, among other things, that the "pickup" of defendant at the Welsh home in the early morning hours of April 7, 2001 by four detectives of the Broward Sheriff's Office was a "de facto" arrest and a Fourth Amendment "seizure" of the defendant. The court ruled that based on "the totality of the facts and circumstances" known by the detectives at the time of their arrest of the defendant, the detectives had probable cause to arrest her.
The trial court further found that the defendant waived her right to talk to her father before interrogation and that the police did not coerce her into talking. Noting that the defendant was a straight "A" student with a 12th grade education, the trial court ruled that the defendant had knowingly and intelligently waived her rights despite the fact that the Miranda form advised her of her right to an attorney "before" questioning but not "during" questioning. The court further ruled that certain statements made by the defendant prior to being read her rights did not render the statements involuntary, given that she renewed them post-Miranda.
Thereafter, the defendant filed a renewed motion to suppress, citing our recent decision in Roberts v. State, 874 So.2d 1225 (Fla. 4th DCA 2004). We held there that Miranda warnings that did not include advisement of the right to have an attorney present during questioning were inadequate to fully inform the defendant of his constitutional rights. Based on Roberts, the trial court granted the defendant's renewed motion to suppress statements and vacated its previous order.
The state appealed the suppression of the defendant's statements. Although it acknowledges in its brief that, under Roberts, the Miranda warning given to the defendant was defective, it argues that the evidence adduced at the suppression hearings did not support the trial court's ruling that the defendant was in custody such that Miranda warnings were required.
A trial court's ruling on a motion to suppress is presumed correct. State v. J.D., 796 So.2d 1217, 1218 (Fla. 4th DCA 2001). In reviewing a ruling on such a motion, we "interpret the evidence and reasonable inferences and deductions drawn from the evidence in a manner most favorable to sustaining the trial court ruling." Id.; see also Connor v. State, 803 So.2d 598 (Fla.2001). The standard of review applied to orders denying a motion to suppress is mixed: the court's factual findings are accorded deference and will be upheld if supported by competent, substantial evidence; legal conclusions, however, are reviewed de novo. State v. C.F., 798 So.2d 751, 754 (Fla. 4th DCA 2001); see also Harris v. State, 761 So.2d 1186, 1187-88 (Fla. 4th DCA 2000) (stating that orders denying suppression of evidence are reviewed de novo; factual findings of the lower court are reviewed for competent, substantial evidence, although whether "as a matter of law those facts amount to a reasonable suspicion or probable cause" is determined de novo).
*116 It is well-settled that the safeguards provided by Miranda apply only if an individual is in custody and is subject to interrogation. Sapp v. State, 690 So.2d 581, 585 (Fla.1997); Johnson v. State, 800 So.2d 275, 277 (Fla. 1st DCA 2001); Ramsey v. State, 731 So.2d 79, 81 (Fla. 3d DCA 1999). Courts have defined "custody" in various ways. Simply put, the test is whether, from an objective point of view, the individual would believe he or she is free to end the encounter with law enforcement. See Roman v. State, 475 So.2d 1228, 1231 (Fla.1985) (explaining, "the ultimate inquiry is simply `whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest'") (citations omitted). The court must consider how a reasonable person would react given the "totality of the circumstances" of the situation. See State v. Poole, 730 So.2d 340, 342 (Fla. 3d DCA 1999); Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
Not every encounter between a citizen and police is custodial. By its very nature, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Roman, 475 So.2d at 1232. Nevertheless, it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Bostick, 501 U.S. at 434, 111 S.Ct. 2382 (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
We have employed a four-factor test for determining whether a suspect is in custody:
(1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his guilt; and (4) whether the suspect is informed that he or she is free to leave.
C.F., 798 So.2d at 754 (quoting Mansfield v. State, 758 So.2d 636, 644 (Fla.2000)).
To begin our analysis, we note that the Florida Supreme Court has held that the question of whether a suspect is in custody is one of mixed fact and law. Ramirez v. State, 739 So.2d 568, 574 (Fla. 1999). The court delineated the test that reviewing courts must conduct in determining whether a suspect was in custody:
Two discrete inquiries are essential to the determination [of whether a defendant was "in custody" for Miranda purposes]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness [under federal statutory law]. The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.
Connor v. State, 803 So.2d 598, 606 (Fla. 2001) (quoting Thompson v. Keohane, 516 U.S. 99, 112-15, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).
In conducting the first stepexamining the circumstances surrounding the interrogationwe consider the factual findings made by the trial court in its order on the defendant's motion to suppress. In its *117 findings, the trial court noted that the defendant first spoke with detectives on the night of April 4, 2001, while they were canvassing the area. The defendant next encountered the officers early in the morning on April 7, 2001, when they came to the Welch home. The court found that the officers "asked the Defendant and her sister to `accompany' them to the Broward Sheriff's Office for questioning about the `baby case.'" The court also found that the defendant was not told that she could refuse to accompany the officers. The court further found that the defendant was told that her father would be informed of her location.
The court recognized conflict in the testimony of the witnesses regarding whether the defendant specifically requested that her father be present while she was being questioned. The court concluded that "having weighed the credibility of the witnesses and having considered the totality of the circumstances, [it] resolves the conflict in favor of the State's witnesses, and finds that the Defendant's father was notified that his daughter was being questioned by police." The court determined that the defendant did not request to see her father before she was questioned.
The court found that detectives told the defendant that they knew she had delivered a baby. The court further found that the defendant was not given her Miranda rights, told she could leave, or informed that she did not have to talk to the officers; however, the court also found that she was specifically advised that she was not under arrest. The court noted that the defendant was interviewed for three hours.
The court found that the detectives advised the defendant of her Miranda rights using the Broward Sheriff's Office form. It noted that the detectives stated that the defendant never requested the presence of an attorney or her father during questioning. During the interview, the defendant admitted that the baby in the backpack was hers, that she had given birth to it, that she believed it to be dead at birth, and that she disposed of it in a nearby canal.
Applying the law to these factual findingsthe second step in our two-step inquirywe next determine whether the defendant was in custody. We are guided by the four-factor test outlined above. Here, after advising the defendant the night before that they would return the next day, four detectives came to the Welches' home around 8 a.m. The girls, thus, should have expected the return of the officers because they were so informed the previous evening.
Sergeant O'Neil testified that he requested the participation of a female officer, Juanita Reid, because of the "sensitive" subject matter of the investigation. After the girls were woken by Mr. Welch, Detective Reid greeted them and gave them time to dress. The defendant and Kim were then asked to return with the detectives to the police station to talk about the "baby case." They were specifically told that their father would be notified of their whereabouts. There is no evidence that the girls were threatened, coerced, or cajoled to accompany the officers. They were not handcuffed nor told that they were under arrest. There is no evidence that the defendant did not voluntarily accompany the officers. Poole noted that simply because a person responds to an officer's request without first being told that he or she may decline does not mean that the encounter is not consensual. 730 So.2d at 342. However, the presence of multiple officers and the fact that they wore side arms may indicate that the girls did not feel free to ignore the officers' request. See id. at 342 (circumstances that indicate the seizure of a person *118 "would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled") (quoting U.S. v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).
Regarding the second factor in the four-factor testthe location of the questioningthe defendant and her sister were questioned at the Public Safety Building. Our supreme court has noted that simply holding an interrogation at a police station does not, by itself, turn an otherwise noncustodial interrogation into a custodial one. Roman, 475 So.2d at 1231; Ramsey, 731 So.2d at 80. The location of the interrogation is simply one factor. See Bostick, 501 U.S. at 437, 111 S.Ct. 2382.
The third factor is "the extent to which the suspect is confronted with evidence of his guilt." C.F., 798 So.2d at 754. In Ramirez, the court found that the defendant, a juvenile with only limited contact with the criminal justice system, was in "custody," in part, because he was never told he was free to leave, and the questions directed at him indicated that the officers considered him a suspect. 739 So.2d at 574. Here, the detectives did not inform the defendant that she was a suspect when they arrived at the Welches' home on the morning of April 7 or during the drive to the Public Safety Building. However, while in the waiting room prior to her interview, Detective Murray told the defendant that he knew that she had given birth and that this was the reason she was there. Arguably, the defendant was "confronted with evidence of her guilt" when Murray told her that he believed she was responsible for the dead baby. Moreover, she likely did not feel free to leave after Murray made this statement.
Finally, we consider whether the defendant was told that she could leave. Here, the officers, the defendant, and her sister all testified that the girls were never expressly told that they were free to refuse the detectives' request to accompany them to the station or that they were free to leave once they arrived. There is no indication on the record that the defendant believed she could refuse the officers' requests, particularly after she was told that they knew she had delivered the baby that was found. Cf. Ramsey, 731 So.2d at 80 (where a suspect voluntarily spoke with detectives on several occasions and voluntarily came to the station, simply because he was not told that he was not free to leave did not mean he was in custody).
Given the totality of the circumstances, we agree with the trial court that the defendant was in custody for Miranda purposes. We need not consider the defendant's particular mindset. See State v. Gilles, 701 So.2d 375, 377 (Fla. 3d DCA 1997). However, we may consider her youth and lack of exposure to the criminal justice system. See Ramirez, 739 So.2d 568. In sum, the evidence revealed at the suppression hearings shows that the defendant was approached in the early morning hours by four plain-clothes officers wearing badges and sidearms and was asked to accompany them to a police station for questioning about the "baby case." She was never told that she could refuse to accompany them to the station or that once she had arrived, she could leave; nor is there evidence that she had the means to leave if she so desired. Further, there was credible testimony that once the defendant reached the station, a detective told her he believed she had delivered and disposed of the baby that was found. The defendant was then taken to an interview room, where she was read her Miranda rights and questioned for three hours. *119 See Raysor v. State, 795 So.2d 1071, 1072 (Fla. 4th DCA 2001) (holding, once a suspect is read her Miranda rights, she may reasonably assume that she is not free to leave).
As the trial court found, the defendant was not properly warned of her right to counsel during police questioning. Rather, she was given warnings identical to those we found inadequate in Roberts.[2] Accordingly, we affirm the order granting her motion to suppress statements.
Affirmed.
STEVENSON, C.J., and GUNTHER, J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] We also note that the defendant was not provided the warnings we determined to be sufficient in Canete v. State, 921 So.2d 687 (Fla. 4th DCA 2006).