PER CURIAM.
Clark MacKendrick appeals his convictions for capital sexual battery and lewd or lascivious molestation. MacKendrick contends that the trial court erred in denying the motion to suppress his incriminating statement and other evidence, disclosed during a custodial interrogation before deputies read his Miranda rights.* Finding this suppression issue dispositive, we reverse and remand for a new trial, thereby mooting a second, separate issue relating to the denial of a motion for mistrial.
I. Facts
The amended information alleged that MacKendrick committed sexual acts against a minor, H.M., on various occasions between July 28, 2003, and July 28, 2005. At the suppression hearing, the State established that on February 21, 2007, MacKendrick was incarcerated at the Okaloosa Correctional Institution for another offense. On that date, two deputies from the Liberty County Sheriffs Office came to the prison to interview MacKen-drick regarding the allegations that ultimately led to the charges in this case.
MacKendrick testified regarding his summons to the central office. He was in the dorm area when a prison officer directed him to report to the inspector’s office at the center compound. MacKendrick, who is familiar with prison rules and regulations, testified that he heeded the official order because he was told to do so. He explained that his refusal to comply would have constituted disobeying a verbal order, resulting in a disciplinary report. An officer escorted MacKendrick through two secured doors out of the dorm area and frisked him for contraband. When an officer inquired why he was being called to the office, MacKendrick said he did not *134 know the reason. The officer commented that MacKendrick must have done something wrong. In the prison warden’s presence, the inspector took MacKendrick to an eight-by-eight room in the “admin” area. MacKendrick testified that after the inspector shut the door behind him, it remained closed during the ensuing interview. MacKendrick denied initiating the interview or voluntarily going to the room. He professed to have no idea why he had been summoned to the office and then to the interview room. MacKendrick encountered Deputies Swier and Bateman, dressed in plain clothes, waiting for him inside the room.
Deputy Swier testified regarding the circumstances that led to the prison interview. Swier became the lead investigator in this case after the mother of eleven-year-old H.M. provided information to authorities concerning sexual abuse by MacKendrick. This led to the victim’s taped forensic interview with the Child Protection Team. The allegations in that interview prompted Swier to arrange with prison authorities to interview MacKen-drick at the institution. Swier characterized the purpose of his visit as a fact-finding mission to get MacKendriek’s version of the story. The deputies brought with them a laptop computer, a blank tape, an audio recorder, and the victim’s DVD interview.
The interview room was an administrative office, which had a table, desk, and a few chairs. Swier testified that as MacK-endrick was escorted into the room, he appeared shocked to see Swier, whom MacKendrick remembered as the investigator in the prior case that led to his incarceration. MacKendrick asked what Swier and Bateman wanted and why they were there. Swier informed him of H.M.’s allegations. The deputies wanted to hear what MacKendrick had to say. Initially, according to MacKendrick, he doubted whether the victim had really made allegations of sexual abuse. He repeatedly denied the truth of the allegations.
Swier testified that he had no idea whether prison rules and regulations required MacKendrick to appear for questioning. Swier did not discuss with prison officials the terms and conditions of the interview. MacKendrick did not receive Miranda warnings before the interview, which was not recorded. After MacKen-drick sat down in the room, the deputies played H.M.’s interview. Swier testified that as MacKendrick listened to the victim’s specific allegations of sexual abuse, MacKendrick began shaking and seemed very nervous. Toward the end of the DVD, after H.M. had presented details of the sexual abuse, MacKendrick told the investigators to turn it off, and they complied. MacKendrick testified that he told the deputies to turn off the DVD, not because he was nervous, but because he thought he needed a lawyer.
Swier testified that he then told MacK-endrick: “You’re saying it didn’t happen, she’s saying it did. Somebody’s not telling the truth.” According to Swier, MacKen-drick replied: “If she said it, it must be true.” In Swier’s view, this was an incriminating remark that converted what had been a voluntary interview into a custodial interrogation. Swier testified that in a prior, totally separate investigation, MacK-endrick had spoken of his past episodes of becoming intoxicated and experiencing alcoholic blackouts. Swier inquired as to whether this could have happened regarding the present allegations.
At that point in the interview, after MacKendrick made the incriminating statement, Swier decided it was time to give Miranda warnings for the first time. Before administering the warnings, Swier told MacKendrick that he wanted to obtain *135 a formal taped statement. MacKendrick testified that he initially agreed to give a statement. Just as he seemed about to waive his rights, however, MacKendrick changed his mind and told the deputies: “I can’t do it. You know I’m not waiving my rights.” The interview ended, and the deputies left MacKendrick alone in the room until an officer escorted him back to his cell. About thirty minutes elapsed from the beginning of the interview to the end. At no time during the interview was MacKendrick formally arrested. Subsequently, Swier filed a probable cause affidavit in the court, and an arrest warrant was issued. ’
In Swier’s opinion, the questioning started out as a voluntary interview, and MacKendrick could have left whenever he wanted to do so. MacKendrick was not shackled or handcuffed during the questioning. Swier did not recall whether Bateman had left the room during the interview. The deputy acknowledged that he never informed MacKendrick that he was free not to talk or free to leave the room and return to his cell anytime. Swier testified that he did not give Miranda warnings at the onset of the interview because he was not sure what MacKen-drick’s version of the facts would be, and whether H.M.’s allegations were true.
MacKendrick provided a somewhat different account of certain details surrounding the interview. After the inspector shut the door and left MacKendrick with the deputies, Swier asked MacKendrick how he was doing. He answered: “I’m doing as best I can, considering my situation.” MacKendrick observed Swier’s gold star and knew that Swier was a law enforcement officer. MacKendrick testified that he believed he had to answer the questions. He did not feel that he had the right to leave the interview. The door to the room was locked. When Bateman left and tried to re-enter the room, he had to keep knocking to gain admittance.
MacKendrick testified that Swier never advised MacKendrick about his right to a lawyer before asking for a taped formal statement. After Swier read Miranda rights and asked him to sign a piece of paper, MacKendrick replied: “No. I need an attorney.” According to MacKendrick, he had orally indicated that he needed to talk to an attorney as soon as he viewed H.M.’s interview and asked the investigators to stop the DVD. This was before Swier read his Miranda rights. MacKen-drick denied ever saying to Swier that if the victim had said it, then it must be true. MacKendrick told the court that what he really said was: “Everything that these people say about me down there, you think is true.” MacKendrick complained that nothing he told Swier was believable enough for Swier to accept his side of the story. MacKendrick testified that at the conclusion of the interview, the prison inspector escorted MacKendrick out of the room and through a high-security area. MacKendrick reported back to an officer, was frisked again, and was taken back to the dorm.
The motion to suppress asked the trial court to suppress “all statements, gestures or other incriminating evidence obtained at the prison” and to rule it inadmissible at trial. After hearing arguments of counsel, the trial court commented that the mere fact that MacKendrick was incarcerated at the time of the interview, and certainly was not free to leave the institution of his own accord, did not mean he was not free to leave the room. The judge opined that MacKendrick’s belief that he was not at liberty to leave did not make it so. Concluding that the interview was not a custodial interrogation for purposes of Miranda, the court denied the motion to *136 suppress without additional comment or factual findings.
At the trial (over which a different judge presided), Deputy Swier testified about the background information and H.M.’s interview with the Child Protection Team, which led the deputies to schedule the interview with MacKendrick. The parties agreed that the jury would not be told that the interview with MacKendrick took place while he was incarcerated. Describing the interview, Swier testified that after MacK-endrick became quite upset while listening to H.M.’s interview and told them to turn it off, they did so. After that, according to Swier, MacKendrick commented that if the victim said it, then it must be true. H.M. testified at the trial, and the jury viewed the victim’s interview. MacKendrick chose not to testify at the trial. The jury found him guilty as charged on both counts, and the court sentenced him to concurrent terms of life in prison.
II. Standard of Review
The trial court’s ruling on a motion to suppress presents a mixed question of fact and law. State v. Glatzmayer, 789 So.2d 297, 301 & nn. 4, 7 (Fla.2001); Panter v. State, 8 So.3d 1262, 1265 (Fla. 1st DCA 2009).
The United States Supreme Court has stated that mixed questions of law and fact that ultimately determine constitutional rights are to be reviewed by the appellate courts applying a two-step approach. Deference is to be shown to the trial court on questions of historical fact, but de novo review of the application of a constitutional standard to the facts in a particular case is proper.
Brye v. State, 927 So.2d 78 (Fla. 1st DCA 2006) (emphasis in original) (citing United States v. Bajakajian, 524 U.S. 321, 336 n. 10, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)); see Fitzpatrick v. State, 900 So.2d 495, 510 (Fla.2005); Connor v. State, 803 So.2d 598, 605-06 (Fla.2001). We must view the evidence adduced at the suppression hearing in a light most favorable to sustaining the trial court’s ruling. San Martin v. State, 705 So.2d 1337, 1345 (Fla.1997).
III. Law
This appeal requires us to determine whether the prison interview constituted a “custodial interrogation” because “Miranda warnings must precede any ‘custodial interrogation.’ ” Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir.1994) (citing Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. 1602); see Sapp v. State, 690 So.2d 581, 585 (Fla.1997) (stating that the Miranda safeguards against self-incrimination are triggered only by the presence of a custodial setting and official interrogation); Duddles v. State, 845 So.2d 939, 941 (Fla. 5th DCA 2003). In the Miranda line of decisions, ‘“custody5 is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.” Howes v. Fields, — U.S. -, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). For purposes of Miranda:
[T]he term “interrogation” ... refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.
Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Everett v. State, 893 So.2d 1278, 1284 (Fla.2004).
In resolving the issue of whether a person was “in custody” for Miranda purposes, the focus is primarily on the perception of the suspect defendant, rather than the intent of law enforcement. Rhode Island v. Innis, 446 U.S. at 301, 100 *137 S.Ct. 1682; Timmons v. State, 961 So.2d 378, 380 (Fla. 4th DCA 2007). To make this determination, a court must decide whether, under the totality of the circumstances, a reasonable person in the suspect’s position would feel a restraint of his or her freedom of movement, i.e., would not feel free to stop talking or terminate an encounter with the police (or other law enforcement officials) and leave. Ross v. State, 45 So.3d 403, 415 (Fla.2010); Buddies, 845 So.2d at 941.
In its recent decision in Howes v. Fields, the United States Supreme Court considered whether an interview was a “custodial interrogation” for purposes of Miranda. Howes, like the instant case, involved deputies questioning a person who already was “in custody” and subject to institutional restrictions by virtue of being an inmate serving a sentence in jail or prison for a different offense from the subject of the interview. The Court stated that the first step in the analysis involves ascertaining whether, given “the objective circumstances of the interrogation,” a reasonable person would have believed that he or she was not free to end the interrogation and leave. 132 S.Ct. at 1189 (quoting Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)); Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). “Relevant factors include the location of the questioning,” “its duration,” “statements made during the interview,” “the presence or absence of physical restraints during the questioning,” and “the release of the interviewee at the end of the questioning.” Howes, 132 S.Ct. at 1189; see Maryland v. Shatzer, 559 U.S. 98, 130 S.Ct. 1213, 1224-26, 175 L.Ed.2d 1045 (2010); Stansbury, 511 U.S. at 325, 114 S.Ct. 1526; Berkemer v. McCarty, 468 U.S. 420, 437-38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990) (listing among the relevant factors whether the suspect “initiated contact with authorities,” “was informed at the time of the questioning that the questioning was voluntary,” and “possessed unrestrained freedom of movement during questioning”).
“Determining whether an individual’s freedom of movement was curtailed, however, is simply the first step in the analysis, not the last.” Howes, 132 S.Ct. at 1189. A court must ask “the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.” Id. at 1190. Applying this analysis, the Court in Howes v. Fields ultimately determined “that imprisonment alone is not enough to create a custodial situation within the meaning of Miranda.” Id.; Garcia v. Singletary, 13 F.3d at 1491.
The Court provided three reasons for this conclusion. “First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest.” Howes, 132 S.Ct. at 1190. “Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release.” Id. at 1191. “Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who questioned him probably lack the authority to affect the duration of his sentence.” Id.
The facts in Howes v. Fields indicated that, while Randall Fields was serving a sentence in jail, a corrections officer escorted him to a conference room where two sheriffs deputies questioned Fields *138 about allegations that he had engaged in sexual conduct with a minor before coming to prison. 132 S.Ct. at 1185. Fields arrived at the conference room between 7:00 and 9:00 P.M. and was questioned for five to seven hours. Id. at 1186, nn. 1-2. The deputies were armed during the interview, but Fields was not handcuffed or restrained. When the interview began, the deputies told Fields that he was free to leave and return to his cell. Later, they reminded Fields that he could leave whenever he wished. The conference room door was sometimes open and sometimes closed. Id. at 1186.
About halfway through the interview, after being told of the allegations of abuse, Fields became agitated and began to yell. Howes, 132 S.Ct. at 1186. According to Fields, one of the deputies used an expletive, told him to sit down, and stated that if he did not want to cooperate, then Fields could leave. Eventually, Fields confessed to engaging in sexual acts with the child. At the suppression hearing, Fields testified that several times during the interview, he stated that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell before the interview ended. Id. Fields did not return to his cell until well beyond the hour when he usually retired. He did not receive Miranda warnings, nor did the deputies advise Fields that he did not have to speak with them. Id.
Given these circumstances, the Court’s majority determined that Fields was not “in custody” during the interview for purposes of Miranda. Howes, 132 S.Ct. at 1192. Admittedly, some facts supported Fields’ argument that his interview was a custodial interrogation: Fields did not invite the interview or give advance consent to be questioned, the deputies did not advise Fields that he was free not to talk to them, the interview lasted more than five hours and extended well past Fields’ usual bedtime, the deputies were armed, and one of them (according to Fields) used profanity and a sharp tone of voice. Id. at 1192-93.
The Court concluded, nevertheless, that other significant, offsetting factors existed in the record. Howes, 132 S.Ct. at 1193. “Most important” to the Court was the evidence that the deputies told Fields, first at the commencement of the interview and a second time during the interview, that he could leave and return to his cell whenever he wanted. Id. He was not physically restrained or threatened. The interview occurred in “a well-lit, average-sized conference room” in which Fields was “not uncomfortable.” They offered Fields food and water, and the door to the room sometimes was open. Under these objective conditions, a reasonable person would have felt free to stop the questioning and leave. Id.
Addressing the facts that Fields, a jail inmate, required an escort and was not at liberty to move around in the vicinity outside the interview room, the Court noted that the standard prison security conditions still would have required these restrictions, even if Fields had been taken to the room for some purpose other than police questioning. The deputies did not coerce Fields’ cooperation by threatening harsher conditions. Id. “Returning to his cell would merely have returned him to his usual environment.” Id. at 1194.
As a guide in deciding whether custodial interrogation occurred, Florida courts consider the following circumstances:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is *139 informed that he or she is free to leave the place of questioning.
Ramirez v. State, 739 So.2d 568, 574 (Fla.1999); Hunter v. State, 8 So.3d 1052, 1064 (Fla.2008); see Evans v. State, 911 So.2d 796, 799-800 (Fla. 1st DCA 2005). These Ramirez factors involve essentially the same general considerations required under the United States Supreme Court’s Howes v. Fields analysis of the requirements of Miranda.
IV. Analysis
Applying the “reasonable person” analysis to determine whether MacKen-drick was “in custody” during the prison interview for purposes of Miranda, we consider first the manner in which he was summoned for questioning. Ramirez, 739 So.2d at 574; see Howes, 132 S.Ct. at 1185-86. Swier admitted that MacKen-drick arrived at the interview room with no idea why the prison officer had ordered him to appear. MacKendrick did not initiate the interview or submit to it voluntarily. Without contradiction, MacKendrick testified that he had no choice other than to follow orders to come to the inspector’s office and then report to the interview room, or else risk receiving a disciplinary report for disobeying a verbal order. MacKendrick passed through security and was frisked before the interview. He thus submitted to official requests to appear at the office and proceed to the interview room because he was ordered to do so. The presence of high security is consistent with typical prison procedures, which would have been in effect regardless of whether MacKendrick was interviewed. What is relevant to our inquiry is MacKen-drick’s unrebutted testimony that he would have received disciplinary sanctions if he had disobeyed the officer’s verbal order to appear at the inspector’s office.
The second Ramirez factor considers “the purpose, place, and manner of the interrogation.” 739 So.2d at 574; see Howes, 132 S.Ct. at 1189 (considering where the questioning takes places). The interview occurred while MacKendrick was in prison on other charges. His incarceration did not automatically mean, however, that he was “in custody” under Miranda. Howes, 132 S.Ct. at 1190-91; see Joseph v. State, 41 So.3d 307, 310-11 (Fla. 4th DCA 2010); State v. Russell, 814 So.2d 483, 487 (Fla. 5th DCA 2002). Like the Court in Howes v. Fields, we must consider the circumstances surrounding the institutional interview. The inspector escorted MacKendrick to a small room, ushered him inside, and shut the door. MacKendrick did not believe he had the ability to refuse, with impunity, the verbal order to show up. The questioning lasted approximately thirty minutes. Deputy Swier stated that the purpose of the interview was to inform MacKendrick of the victim’s allegations and to get his version of the facts.
The third Ramirez factor deals with “the extent to which the suspect is confronted with evidence of his or her guilt.” 739 So.2d at 574; see Howes, 132 S.Ct. at 1189 (considering “statements made during the interview”). Shortly after being ordered to appear in a room for reasons not previously explained to him, MacKen-drick was confronted with H.M.’s very serious allegations. Initially, he questioned whether the victim had really said this, and then he denied the allegations. The deputies played the DVD, in which the victim provided specific details of MacKen-drick’s sexual abuse. Given MacKen-drick’s denial and the victim’s affirmative claims of his wrongdoing, Swier told him that somebody was not telling the truth. Swier testified that after MacKendrick became shaken and nervous and asked the investigators to stop the DVD, he made the incriminating statement that if the vie- *140 tim said it, then it must be true. This occurred before Swier read Miranda rights. Clearly, the deputies presented evidence which, if true, showed that MacK-endrick was guilty of one or more serious crimes.
The final factor in Ramirez addresses “whether the suspect is informed that he or she is free to leave the place of questioning.” 739 So.2d at 574; Howes, 132 S.Ct. at 1189, 1193. Swier acknowledged never telling MacKendrick that he was free to stop talking or leave the room. MacKendrick testified that he did not believe he was free to stop talking, to end the interview, or to return to his cell anytime. He was escorted to the interview room by a prison official and believed that he had to comply or else risk sanctions. MacKen-drick gave unchallenged testimony that the door was shut and locked behind him. Pursuant to the analysis of Howes v. Fields and Ramirez v. State, the material facts ultimately indicate that MacKendrick was “in custody” during the interview, under the reasoning of Miranda and its progeny.
Like the record in Howes v. Fields, the instant facts include some evidence that favors the State’s position that the interview was non-custodial. The investigators were in plain clothes, although MacKen-drick saw a star or other indicator of the deputies’ obvious law-enforcement status. MacKendrick was not handcuffed or shackled or mistreated. Swier and Bate-man were present to get MacKendrick’s side of the story, not to arrest him. The interview lasted no more than thirty minutes.
Unlike Howes v. Fields, however, the present record established without dispute that before MacKendrick made the incriminating statement, the deputies never told MacKendrick that he was free to stop talking, to terminate the interview, or to leave the room and return to his dorm cell. The State offered no evidence to contradict MacKendrick’s testimony that he would have faced disciplinary sanctions had he refused to comply with official orders to report to the inspector’s office and proceed to the room. The evidence that Fields was told twice that he was free to leave the interrogation room was deemed the “most important” factor offsetting a finding of “custody” in Howes v. Fields, 132 S.Ct. at 1193. The absence of this significant factor in the instant case distinguishes it from Howes v. Fields and, along with certain other enumerated Ramirez circumstances, compels the conclusion that the prison interview was custodial. Given the “circumstances surrounding the interrogation,” a reasonable person would have felt that “he or she was not at liberty to terminate the interview and leave.” Ross, 45 So.3d at 415 (quoting Yarborough v. Alvarado, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)); see State v. Weiss, 935 So.2d 110, 118-19 (Fla. 4th DCA 2006).
The next part of our inquiry involves whether the interview constituted “official interrogation.” Sapp v. State, 690 So.2d at 585; see Miranda v. Arizona, 384 U.S. at 444, 86 S.Ct. 1602. Clearly, some of Deputy Swier’s questions surrounding H.M.’s allegations, which he asked before reciting Miranda rights, met the definition of “interrogation.” That is, a reasonable person would have known such efforts by law enforcement to obtain MacKendrick’s side of the story, after the disclosure of very serious allegations, were “reasonably likely to elicit an incriminating response.” Rhode Island v. Innis, 446 U.S. at 301, n. 5, 100 S.Ct. 1682 (describing “incriminating response” as “any response — whether inculpatory or exculpatory — that the prosecution may seek to introduce at trial”) (emphasis in original); Moore v. State, 798 So.2d 50, 52-53 (Fla. 1st DCA 2001). Giv *141 en the circumstances demonstrating a custodial interrogation, MacKendrick was entitled to receive Miranda warnings. Ross, 45 So.3d at 417-18; State v. Weiss, 935 So.2d at 118-19.
“Miranda violations are subject to a harmless error analysis.” Deviney v. State, 112 So.3d 57, 2013 WL 627140 *20 (Fla. Feb. 21, 2013); see Ross, 45 So.3d at 434. The State argues that even if the interrogation was custodial, any error in admitting MacKendrick’s incriminating statement was harmless beyond a reasonable doubt. The State has the burden to demonstrate there is no reasonable possibility that the error affected the verdict. State v. DiGuilio, 491 So.2d 1129, 1138-39 (Fla.1986). In conducting a “harmless error” analysis, we must review the permissible evidence on which the jury could have relied, and examine even more closely the impermissible evidence, focusing on the effect of the error on the jury. Fitzpatrick, 900 So.2d at 517; DiGuilio, 491 So.2d at 1138.
The jury heard Swier, a law-enforcement officer, testify that after watching the victim’s interview, MacKendrick remarked that if H.M. said it, then it must be true. A statement like this, made by the suspect himself, was highly incriminating. This statement related directly to the allegations that formed the basis of the charges.
Admittedly, Swier’s testimony concerning MacKendrick’s admission was very brief, and the prosecutor mentioned it only briefly during closing argument. The State contends that its evidentiary case against MacKendrick was strong. This argument misses the point. The Florida Supreme Court has repeatedly instructed the courts that the “harmless error” test in State v. DiGuilio is not simply an “overwhelming evidence of guilt” test. See Johnson v. State, 53 So.3d 1003, 1005-06 & n. 3 (Fla.2010); Ventura v. State, 29 So.3d 1086, 1089-90 (Fla.2010). Instead, “harmless error” analysis is directed to the effect of the error on the trier-of-fact. See Johnson, 53 So.3d at 1007; DiGuilio, 491 So.2d at 1139.
Having examined all the evidence presented to the jury, we cannot say that the State met its burden to show harmless error. H.M. waited several years before reporting MacKendrick’s sexual abuse. Under oath, the victim intermittently denied the truth of her serious allegations, while at other times accusing MacKendrick of committing specific acts of sexual abuse. At the trial, the defense pointed out the victim’s inconsistent claims. The theory of defense was that H.M. was unreliable and had ulterior motives, unrelated to any criminal act by MacKendrick, to accuse him of sexual abuse. H.M. testified at the trial, where her credibility was a key issue. Given the passage of considerable time between the alleged sexual abuse and the victim’s disclosure of this information to her mother and to law enforcement authorities, investigators found no corroborating physical evidence of inappropriate sexual conduct. The State relied primarily on the victim’s allegations and her Child Protection Team interview. On this evi-dentiary record, we cannot conclude that MacKendrick’s incriminating statement did not affect the verdict.
For these reasons, we reverse the convictions and remand for a new trial.
BENTON, C.J., ROBERTS, and RAY, JJ., concur.

 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).